**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**LUFTI SAID SAALIM,**

Plaintiff,

v.

**WALMART, INC., et al.,**

Defendants.

CASE NO. 3:21 CV 1481

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

## INTRODUCTION

Pending before the Court are multiple motions for summary judgment. First, Plaintiff Lufti Said Saalim and Defendants Sheriff Michael J. Navarre, Deputy Sheriff Jeffrey M. Bretzloff, and Deputy Sheriff Justyn McNett (collectively the "County Defendants"), cross-moved for summary judgment on Plaintiff's excessive force claim brought pursuant to 42 U.S.C. § 1983 against Defendant Bretzloff. *See* Docs. 136 & 138, 142. Second, the County Defendants seek summary judgment on Plaintiff's remaining municipal liability claims against Navarre in his official capacity, and state law claims for vicarious liability and negligent hiring, supervision, training, and retention against McNett. *See* Doc. 138, at 15–20. The Parties' Motions on these issues are fully decisional. *See* Docs. 150, 154, 157, 160.

Further pending before the Court is a Motion for Summary Judgment filed by Defendants Walmart, Inc. and Walmart Stores East, L.P. (collectively the "Walmart Defendants"). (Doc. 137). The Walmart Defendants seek summary judgment on Plaintiff's remaining state law vicarious liability and negligent hiring, supervision, training, and retention claims. *See id.* at 2. This Motion, too, is fully decisional. *See* Docs. 151, 156.

Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 & 1367. For the reasons discussed below, the Court grants the County Defendants' and Walmart Defendants' respective Motions for Summary Judgment and denies Plaintiff's Motion for Partial Summary Judgment.

## Background

Factual Background

This case arises from Plaintiff's arrest outside of a Walmart Supercenter in Toledo, Ohio on April 12, 2020. Plaintiff, then a driver for a "Black & White Cab" company, dropped off two individuals at Walmart so that they could pick up their prescription medications from the pharmacy. *See* Plaintiff Dep., Doc. 130-1, at 41, 51–54. While Plaintiff maintains he did not know he parked in a fire lane outside the Walmart, *see id.* at 141; Doc. 150, at 11 (collecting other citations), he does not directly contest that he did, in fact, park in a fire lane, *see* Rolen Dep., Doc. 132-1, at 25 (noting the "slanted lines" on the ground indicating parking was prohibited); Bretzloff Dep., Doc. 124-1, at 198–200; Bretzloff Bodycam, 0:00–:07.[1]

Michael Rolen, an automotive technician with Walmart at the time of the incident, approached Plaintiff and requested he move his vehicle out of the fire lane. *See* Rolen Dep., Doc. 132-1, at 36; Plaintiff Dep., Doc. 130-1, at 67–68.[2] Rolen avers Plaintiff declined to move his car and stated, "go away or I'm going to kick your ass." (Rolen Dep., Doc. 132-1, at 40).[3] Rolen then

---

1. Plaintiff briefly asserts it "remains a question of fact" whether he parked in a fire lane. *See* Doc. 150, at 18. However, he cites no evidence beyond his own lack of knowledge and memory to contradict that which Rolen, Bretzloff, and the bodycam footage provide on this point. *See Farris v. Oakland Cnty*., 96 F.4th 956, 966 (6th Cir. 2024).

2. To be clear, the Parties dispute the specifics of this interaction (and many others). *Compare* Plaintiff Dep., Doc. 130-1, at 67 ("[Rolen] said get out of here you shit."); *with* Rolen Dep., Doc. 132-1, at 36 ("I told [Plaintiff] it's a fire lane, he needs to move . . . I asked him nicely and everything . . . He told me to get my [f*****g] redneck ass away from his car.").

3. Plaintiff denies threatening Rolen. *See* Plaintiff Dep., Doc. 130-1, at 71. Further, Plaintiff states he exited his vehicle to confront Rolen, while Rolen cannot remember one way or another. *See* Rolen Dep., Doc. 132-1, at 56; Plaintiff Dep., Doc. 130-1, at 72.

approached Bretzloff, an off-duty Lucas County Sheriff's Deputy providing private security services for Walmart,[4] *see* Bretzloff Dep., Doc. 124-1, at 308–09,[5] to notify him of the situation, *see* Rolen Dep. Doc. 132-1, at 36. Bretzloff had overheard some yelling between Plaintiff and Rolen and, during his conversation with the latter, learned Rolen had asked Plaintiff to leave the fire lane. *See id.*; Bretzloff Dep., Doc. 124-1, at 193–195. Rolen did not tell Bretzloff Plaintiff had threatened him in any way. *See* Rolen Dep., Doc. 132-1, at 50.[6]

At this point, Bretzloff activated his bodycam, began recording, and approached Plaintiff. *See* Bretzloff Dep., Doc. 124-1, at 202–03. As Bretzloff approaches, Plaintiff has his driver's side window down with his hand resting on the driver's side door. (Bretzloff Bodycam, 0:06–:09). The interaction begins friendly enough, as Bretzloff states "howdy, sir" to which Plaintiff replies, "how are you, sir?" *Id.* at :09–:10. Bretzloff asks "what are we doing?" and Plaintiff responds by explaining how Rolen approached his car and "started insulting" him. *See id.* at 0:10–:13; *accord* Plaintiff Dep., Doc. 130-1, at 85. Bretzloff asks to see Plaintiff's driver's license and, while Plaintiff confirms he possesses one, he asks "why do you need to see my driver's license?" after Bretzloff asks to see it a second time. (Bretzloff Bodycam, 0:13–:18). Plaintiff continues to ask why Bretzloff needs to see his license, to which Bretzloff replies "I'll give you about two more seconds and I'm going to make this an official stop. Do you want to make it an official stop or you just want to keep it cool?" *Id.* at 0:19–:27. Again, rather than produce his license, Plaintiff states:

---

4. As discussed further *infra*, Plaintiff and the Walmart Defendants dispute whether Bretzloff was an employee or independent contractor acting in a public capacity for Walmart. *See* Doc. 137, at 10–14, Doc. 151, at 23–26.

5. While serving as off-duty private security for Walmart, Bretzloff wore his Lucas County Sheriff's uniform. (Bretzloff Dep., Doc. 124-1, at 309).

6. While no Party objects to the consideration of these statements on hearsay grounds, the Court notes the description Rolen offers Bretzloff of his conversation with Plaintiff is relevant not for its truth, but for its impact on Bretzloff or, more precisely, on the hypothetical reasonable officer's belief in what level of force may be necessary. *See* Fed. R. Evid. 801(c)(2).

"No, I am asking you a question: what's the problem?" to which Bretzloff unequivocally replies "you're parking in a no parking zone." *Id.* at 0:27–:35.

Rather than hand over his license, Plaintiff attempts to explain he is waiting for the passengers he dropped off. *Id.* at 0:35–:37. For roughly the fourth time, Bretzloff asks Plaintiff to produce his driver's license. *See id.* at 0:37–:39. Plaintiff says he will but Bretzloff must "tell him the reason first." *Id.* at 0:39–0:41. Bretzloff then opens the driver's side door of the cab and instructs Plaintiff to "go ahead and step out of the car." *Id.* at 0:41–:43. Bretzloff grabs Plaintiff's left arm and begins to guide Plaintiff out of the car; Plaintiff initially appears compliant, as he places his left foot on the ground outside of his vehicle. *See id.* at 0:43–:46.[7] However, Plaintiff then shifts his weight back into the vehicle with his right arm remaining on the steering wheel. *See id.* at 0:46–:49. Plaintiff says, "stop forcing me" and asks Bretzloff what he did wrong. *See id.* After Plaintiff shifts his weight back into the vehicle while Bretzloff retains a hold on his arm, Bretzloff draws his taser, points it at Plaintiff, and states firmly, "get out of the car, now." *Id.* at 0:49–:55. Plaintiff does not get out of the car, and instead repeats his complaint about Rolen approaching and insulting him. *See id.* at 0:55–57.

Now, for the third time, Bretzloff tells Plaintiff to "step out of the car." *Id.* at 0:59–1:01. Once again, Plaintiff does not exit the car. Instead, he states "hold on, hold on, let's talk, let's talk." *Id.* at 1:02–:05. Bretzloff tells Plaintiff to exit the vehicle for the fourth time, stating, "I'm going to tase you if you don't get out of the car." *Id.* at 1:06–:08. Plaintiff then exits the vehicle; Bretzloff turns him around, presses Plaintiff chest-first against the vehicle, and instructs him to place his

---

7. In his deposition, Plaintiff described Bretzloff as "open[ing] [his] door and yanking [him] out of the car." *See* Doc. 130-1, at 86. The bodycam footage belies this assertion, at least with respect to this initial contact.

hands against it. *See id.* at 1:08–:13.[8] Plaintiff then begins to turn towards Bretzloff and remove his hands from the car, at which point Bretzloff places his taser into Plaintiff's back and states, "don't come off." *See id.* at 1:10–:15; *accord* Plaintiff Dep., Doc. 130-1, at 88 (Plaintiff's testimony he "turned around because [he] was trying to face and talk to [Bretzloff]"). Plaintiff repeatedly asks some variation of "what did I do wrong?" throughout all phases of the encounter. *See, e.g.*, Bretzloff Bodycam, 1:10–:20.

Against Bretzloff's instructions, and while Bretzloff has a physical hold on him and is pointing a taser in his direction, Plaintiff fully turns around to face Bretzloff. *See id.* at 1:17–:22. At this point, Bretzloff tells Plaintiff to "stop resisting" and places the taser against Plaintiff's abdomen. *Id.* Bretzloff then turns Plaintiff around, presses him back up against the vehicle, and again instructs Plaintiff to put his arms "on top of the car." *Id.* at 1:25–:35. Plaintiff continues to protest, ask what he did wrong, and gesture with his hands. *See id.* Bretzloff moves to handcuff Plaintiff, at which point his bodycam falls to the ground camera-side-up. *See id.* at 1:36–:43. When the camera comes to rest, Plaintiff, against Bretzloff's instructions, has turned away from the car to face Bretzloff and has removed his hands from the top of the vehicle. *See id.* at 1:43; *accord* Plaintiff Dep., Doc. 130-1, at 134 ("Q: You turned around and faced [Bretzloff], didn't you? A: Yes. Q: After being told to put your hands on the roof? A: Yes."). Despite being advised he had parked in a no parking zone, failing to produce a license, and refusing to heed Bretzloff's commands, Plaintiff again asks what he did wrong. *See id.* at 1:43–:44. Bretzloff deploys his taser. *Id.* at 1:44–:47.

---

8. On appeal from a prior ruling of the Court in this case, the Sixth Circuit suggested Plaintiff may have been "slam[med]" into the vehicle, but the bodycam footage does not depict this and Plaintiff did not testify to this effect. *Saalim v. Walmart*, 97 F.4th 995, 1009 (6th Cir. 2024); Plaintiff Dep., Doc. 130-1, at 129–32.

Plaintiff exclaims and asks Bretzloff what he is doing. *See id.* at 1:46–:49. Rather than submit, Plaintiff uses his left arm to grab Bretzloff's right, moves his hands back and forth preventing Bretzloff from obtaining a firm grasp on Plaintiff, and continues to protest by stating "call your supervisor" and, once again, asks what he did wrong. *See id.* at 1:48–:55. Bretzloff again tells Plaintiff to "stop resisting" to which Plaintiff replies he is "not resisting." *Id.* at 2:00-:02. Bretzloff then deploys his taser in "drive stun" mode[9] for approximately six or seven seconds. *See id.* at 2:02–:09. Plaintiff screams he is a diabetic and yells in pain. *See id.* Bretzloff again tells Plaintiff to stop resisting; Plaintiff reaffirms he is not resisting and steps out of the vehicle. *See id.* at 2:09–:12. With Plaintiff facing the vehicle, Bretzloff places him in handcuffs. *See id.* at 2:25–:35. The two men then briefly walk away from the camera's skyward vantage point. *Id.* at 2:35–:37. With Bretzloff back in view of the camera, a brief struggle appears to ensue, as Bretzloff yells "over here" and "stop" as his weight shifts back and forth. *See id.* at 2:37–:42. Finally, Bretzloff instructs Plaintiff to sit on the ground, whereafter Plaintiff can be seen moving to the ground and then exclaiming in pain. *See id.* at 2:58–3:06. In his briefing, Plaintiff argues Bretzloff can been seen "aggressively forcing" him to the ground. *See* Doc. 150, at 19. However, the portions of Plaintiff's testimony cited for this proposition establish, at most, that Bretzloff "pulled" Plaintiff to the ground. *See* Plaintiff Dep., Doc. 130-1, at 141. For his part, Bretzloff claims he merely "assisted [Plaintiff] to the ground." (Bretzloff Dep., Doc. 124-1, at 262).

After this ordeal, the State of Ohio charged Plaintiff with menacing, resisting arrest, obstructing official business, and a parking violation. *See* Doc. 25-4. Plaintiff later entered a no

---

9. A taser is "applied directly to the target" when in drive stun mode, as opposed to "dart mode" in which the taser shoots darts connected to the taser by wire at the target. *Saalim*, 97 F.4th at 1000 n.2 (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 492 (6th Cir. 2012)).

contest plea on the disorderly conduct charge; the remainder of the charges were dismissed. *See* Doc. 20-1; Plaintiff Dep., Doc. 130-1, at 95–98. This lawsuit followed.

Procedural History

Plaintiff's Complaint originally brought the following ten claims against various Defendants: (1) excessive force and unreasonable search and seizure against Bretzloff under the Fourth and Fourteenth Amendments; (2) "*Monell* liability" against Sheriff Navarre and Lucas County; (3) "*Canton* liability" against the same for failure to train; (4) assault against Bretzloff; (5) battery against Bretzloff; (6) false arrest and imprisonment against Bretzloff; (7) intentional infliction of emotional distress against Bretzloff; (8) negligent hiring, training, and/or retention against the Walmart and McNett; (9) vicarious liability under *respondeat superior* against the same; and (10) punitive damages against all Defendants. *See* Doc. 1, at 25–36.

The Court dismissed the second and third claims as to the Lucas County Board of Commissioners on the grounds that Ohio law does not provide county boards of commissioners supervisory authority over county sheriff's departments. *See* Doc. 33, at 4–7. Next, the Court dismissed Plaintiff's claim for false arrest and imprisonment against Bretzloff based on his preclusive no contest plea to disorderly conduct. *See id.* at 7–10. These dismissals remain in effect.

After further motion practice, the Court dismissed Plaintiff's Fourth and Fourteenth Amendment claim against Bretzloff, finding no constitutional violation occurred and, if one did, Bretzloff remained entitled to qualified immunity. *See* Doc. 51, at 5–9. Relatedly, the Court dismissed Plaintiff's municipal liability claims due to the absence of an underlying constitutional violation. *See id.* at 10–11. Plaintiff's remaining state law tort claims against Bretzloff fared no better, as the Court found the statute of limitations barred each. *See id.* at 11–12. Finally, the Court dismissed Plaintiff's negligent hiring, training, supervision or retention and *respondeat superior*

claims against McNett and the Walmart Defendants for the same reason it dismissed the municipal liability claims—the absence of an underlying constitutional injury. *See id.* at 12–14.[10]

Plaintiff appealed. *See* Doc. 53. The Sixth Circuit affirmed in part, reversed in part, and remanded for further consideration. *See Saalim v. Walmart*, 97 F.4th 995 (6th Cir. 2024). The Sixth Circuit affirmed this Court's dismissal of Plaintiff's state law tort claims against Bretzloff. *See id.* at 1011–15. It disagreed, however, with this Court's grant of qualified immunity to Bretzloff for three reasons. First, the Sixth Circuit determined this Court erred in considering Bretzloff's bodycam footage in resolving a motion for judgment on the pleadings where such footage did not "blatantly contradict" the factual allegations in Plaintiff's Complaint. *See id.* at 1002 (citing *Bell v. City of Southview*, 37 F.4th 362, 364 (6th Cir. 2002)). On appeal, the Sixth Circuit "did not consider" Bretzloff's bodycam footage. *Id.* Second, based on the "picture" the "facts alleged in [Plaintiff's] complaint paint[ed]," the Sixth Circuit found he plausibly stated a violation of his Fourth Amendment right to be free from excessive force. *See id.* at 1003–10.[11] Third, the Sixth Circuit determined Bretzloff was not entitled to qualified immunity based on the pleadings, as the facts contained therein demonstrated Plaintiff "was not actively resisting" and his right to be free from tasing and physical force in such a circumstance "was clearly established in April 2020." *Id.* at 1009–10. Because this Court dismissed Plaintiff's derivative state law and federal municipal liability claims based on the absence of an underlying constitutional injury, the Sixth Circuit revived and remanded these claims. *Id.* at 1015–16.

Post-remand, the Parties engaged in substantial discovery and additional dispositive motion practice.

---

10. The Court *sua sponte* dismissed all claims against the Walmart Defendants. *See* Doc. 51, at 14.
11. The *Saalim* court affirmed this Court's dismissal of Plaintiff's excessive force claim brought pursuant to the Fourteenth Amendment. *See Saalim*, 97 F.4th at 1010.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any factual matter in dispute; the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

## DISCUSSION

Qualified Immunity

As it did previously, the Court begins with the gravamen of Plaintiff's case—the excessive force claim against Bretzloff. Bretzloff argues he is entitled to qualified immunity and, accordingly, summary judgment on this claim. *See* Doc. 138, at 9–15. Qualified immunity "spares officers from 'the time, expense and risk of money-damages actions' unless they violate clearly

established constitutional rights.'" *Moore v. Oakland Cnty.*, 126 F.4th 1163, 1167 (6th Cir. 2025) (quoting *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508 (6th Cir. 2012)). Unlike other affirmative defenses, a plaintiff bears the burden of overcoming qualified immunity once a defendant raises it. *See Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021). To do so, a plaintiff must demonstrate: (1) the officers violated the plaintiff's constitutional right; and (2) the violated right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court retains discretion to address each element in either order. *Pearson v. Callahan*, 555 U.S. 223, 236, (2009).

"In identifying clearly established rights, the Supreme Court warns lower courts against defining them 'at a high level of generality.'" *Moore*, 126 F.4th at 1167 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). For all but the most obvious of constitutional violations, the plaintiff must "identify another case that places the constitutional question beyond debate." *Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022). While the facts of the identified case need not be identical to the case at hand, they must be meaningfully similar such that it would "bind a panel of [the Sixth Circuit]." *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022).[12] The material facts of the cited case "must be similar enough that [it] 'squarely governs'" the one before the Court. *Studdard v. Shelby Cnty.*, 934 F.3d 478, 481 (6th Cir. 2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)).

Under the Fourth Amendment test for excessive force, the "operative question is whether the force used was '"objectively reasonable" in light of the facts and circumstances confronting' the officer." *Mosier v. Evans*, 90 F.4th 541, 546 (6th Cir. 2024) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Thus, to overcome the assertion of qualified immunity within the context

12. Because only published opinions bind future panels, Plaintiff may not rely on unpublished Circuit court or any district court opinions to establish the contours of the clearly established right violated by the Officer Defendants. *Bell*, 37 F.4th at 368.

of his Fourth Amendment claim, Plaintiff must point to a case placing the question of whether the Officer Defendant's use of force was "objectively reasonable" beyond debate. *Id.* "'[S]pecificity is especially important' in Fourth Amendment excessive-force cases, where the constitutional boundaries are intensely fact-dependent." *Id.* (alteration in original) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam)).

Here, in light of the bodycam footage, further factual development during discovery, and intervening Supreme Court and Sixth Circuit precedent, the Court finds Plaintiff falls short of his burden.

*Doctrinal Developments*

Going in reverse order, opinions issued by both the Supreme Court and the Sixth Circuit after the latter's decision in *Saalim* either alter or emphasize different aspects of the qualified immunity doctrine applicable to Plaintiff's claim.

In *Barnes v. Felix*, 605 U.S. 73 (2025), the Supreme Court clarified the relevant time window courts should analyze in determining whether an officer's use of force was objectively reasonable under the circumstances. Specifically, the Court found the "moment of the threat" doctrine—which required courts to consider only the seconds immediately preceding the officer's use of force—conflicted with the proper "totality of the circumstances" approach. *See id.* at 81–83. Rather than looking "only to a two-second snippet of the encounter" preceding the use of force, courts should instead look to "any relevant events coming before" including "earlier . . . interactions between[] the suspect and officer." *Id.* at 82–83. After, the Sixth Circuit itself acknowledged its prior "segmented analysis" approach conflicted with the guidance offered in *Barnes*:

> Historically, this Circuit's precedent required the Court to "segment the incident into its constituent parts and consider the officer's entitlement to qualified

> immunity at each step along the way." We would "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." But the Supreme Court's recent holding in *Barnes v. Felix* makes clear that such a segmented approach inappropriately "constricts the proper inquiry into the 'totality of the circumstances.'"

*Hodges v. City of Grand Rapids*, 139 F.4th 495, 517 (6th Cir. 2025) (internal citations omitted) (first quoting *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam); then quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996); and then quoting *Barnes*, 605 U.S. at 79).

This Court applied a version of the now-disfavored "segmented analysis" or "moment of the threat" approach when it originally dismissed Plaintiff's excessive force claim. *See* Doc. 51, at 7 (considering Plaintiff's actions "immediately prior to the use of force"); *id.* ("[T]he court must evaluate only 'the split second judgment made immediately before the officer used allegedly excessive force." (quoting *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019))). And the Sixth Circuit in *Saalim* appeared to do the same at multiple points in its excessive force analysis. *See Saalim*, 97 F.4th at 1008 ("[Plaintiff's Complaint] alleges that the moment before he was tased, [Plaintiff] had both of his hands visible and empty" after "mere[ly] turning to face Bretzloff"); *id.* at 1008 n.8 ("[T]he moment before Bretzloff tased [Plaintiff], [Plaintiff] stood calmly in front of Bretzloff with his hands clearly visible and empty."); *id.* at 1008–09 (separately considering Bretzloff's use of force "before the tasing," after the tasing "when [Plaintiff] was already handcuffed," and during the tasing itself). Thus, rather than limiting itself to considering the events immediately preceding each discrete use of force against Plaintiff,[13] the Court will

13. Much of Plaintiff's briefing on this subject encourages the Court to repeat its use of a "segmented analysis" approach. Despite offering a cursory citation to *Barnes*, Plaintiff encourages the Court to "separate and examine each of the five (5) uses of force identified by Plaintiff" and conducts a separate analysis of each use of force according to the events immediately preceding it. *See* Doc. 142, at 12, 17–19.

consider the whole context of Plaintiff and Bretzloff's interaction in evaluating whether Bretzloff violated Plaintiff's clearly established rights. *See Barnes*, 605 U.S. at 80–81 ("The history of the interaction [between the officer and the suspect], as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force.").

Next, after *Saalim*, the Sixth Circuit clarified there exists a "zone of twilight" in which a suspect "is neither wholly submissive yet neither threatening another nor engaging in active resistance." *Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 604 (6th Cir. 2025).

> In this zone of twilight, when the evidence—viewed in a light most favorable to the plaintiff, but through the lens of a reasonable officer at the scene—presents a "complex situation[]," leaving the exact nature of the threat or degree of resistance unclear, we give officers the benefit of the doubt and excuse any reasonable mistake of judgment in deploying a taser.

*Id.* (quoting *Brown v. Giles*, 95 F.4th 436, 440 (6th Cir. 2024)). The "zone of twilight" between total submissiveness and active resistance in which officers are granted leeway is the "essence of qualified immunity." *Id.* (quoting *Brown*, 95 F.4th at 440). But *Saalim* recognized no such "zone of twilight" and instead drew a firm line between active and passive resistance in connection with its qualified immunity analysis. *See Saalim*, 97 F.4th at 1009–10. That is, the *Saalim* court never considered whether there was some zone of reasonableness beyond submission but short of active resistance in which an officer is entitled to qualified immunity when they tase a suspect. Rather, it treated Bretzloff's entitlement to qualified immunity as entirely contingent on whether Plaintiff actively resisted prior to being tased or subjected to other less-severe forms of physical force. *See id.* at 1010 ("Because Saalim was not actively resisting arrest, his right to be free from tasing and physical force was clearly established in April 2020. Accordingly, Bretzloff is not entitled to qualified immunity."). Such a rigid approach is inconsistent with *Feagin*, which is equally binding on this Court.

*Factual Developments*

Throughout *Saalim*, the Sixth Circuit, as it was required when reviewing this Court's judgment on the pleadings, adopted Plaintiff's version of events which, at this stage of the litigation, no longer reflect the undisputed facts before the Court. In this section, the Court does not endeavor to identify every such discrepancy. Rather, it will highlight a few examples relevant to its renewed qualified immunity analysis.

First, the *Saalim* court relied on Plaintiff's allegation that "Bretzloff never asked [Plaintiff] to get out of the car before he put his hands on [Plaintiff's] left arm." *Saalim*, 97 F.4th at 1006. But the video betrays this allegation, as Bretzloff asks Plaintiff to exit the vehicle as he opens the driver's side door of Plaintiff's vehicle. *See* Bretzloff Bodycam, 0:39–:43. Viewed in context, Bretzloff placed his hands on Plaintiff's arm after he asked him to step out of the vehicle and after Plaintiff had already repeatedly refused to produce a driver's license. Further, the video does not portray the Bretzloff "yank[ing]" Plaintiff out of the car, or otherwise applying significant force at this time. *See* Plaintiff Dep., Doc. 130-1, at 86. At most, Bretzloff begins to attempt to pull Plaintiff from the car. *See* Bretzloff Bodycam, 0:44–:46.

Second, the *Saalim* court did not consider that, after Bretzloff's initial attempt to remove Plaintiff from the car, Plaintiff, against Bretzloff's pulling motion, leans back into his vehicle away from Bretzloff and continues to verbally protest. *See* Bretzloff Bodycam, 0:46–:50. Rather than offering mere verbal protestation and noncompliance, Plaintiff thus physically acted contrary to Bretzloff's attempts to control him. Third, the *Saalim* court did not consider that, when Plaintiff turned around to face Bretzloff after expressly being instructed not to "get off" the car, Bretzloff was grabbing Plaintiff's jacket in an attempt to detain and control Plaintiff. *See* Bretzloff Bodycam, 1:10–:23; Bretzloff Dep., Doc. 124-1, at 238–42. That is, Plaintiff's attempts to turn around were

again contrary to Bretzloff's physical attempts to control his movements, not just his verbal commands. Fourth, after Bretzloff first deployed his taser, Plaintiff remained physically noncompliant, as he hand-fought with Bretzloff and, at one point, even grabbed Bretzloff's right arm with his left. *See* Bretzloff Bodycam, 1:48–:53. Again, the *Saalim* court never considered these facts, as its excessive force and qualified immunity analyses relied solely on the allegations in Plaintiff's Complaint.

*Clearly Established Right*

As recounted above, Plaintiff bears the burden to demonstrate to this Court that Supreme Court and Sixth Circuit case law clearly established his right to be free from the force Bretzloff employed under the circumstances. Plaintiff falls short of that burden.

Initially, the sole case Plaintiff identifies in support of his contention that the contours of his Fourth Amendment right were clearly established is *Saalim* itself. *See* Doc. 142, at 19 (citing *Saalim*, 97 F.4th at 1009–10; Doc. 150, at 19 (same). But the facts now before the Court materially differ from those alleged in Plaintiff's Complaint and, accordingly, assumed to be true by the Sixth Circuit in *Saalim*. Merely gesturing to an appellate holding which, while part of the same case, was rendered at a different stage of the litigation and involved different factual assumptions does not *per se* determine whether Bretzloff is entitled to qualified immunity. As the *Saalim* court itself put it, "Defendants argue that . . . [Plaintiff] actively resisted Bretzloff's attempts to arrest him. A canvas of this circuit's active resistance caselaw illustrates why, *at this stage*, Defendants' arguments fail." *Saalim*, 97 F.4th at 1005 (emphasis added). Thus, Plaintiff cannot meet his burden by simply pointing to *Saalim* without offering any explanation as to why, in light of the bodycam footage and further factual development in discovery, it still "squarely governs" the facts now before the Court. *See Kisela*, 584 U.S. at 104. The Court could grant Bretzloff qualified immunity

and, accordingly, summary judgment on Plaintiff's excessive force claim on this ground alone. *See Lee*, 33 F.4th at 863; *Feagin*, 155 F.4th at 603–04.

Regardless, after consulting the new, undisputed facts in this case, as well as the guidance offered by *Barnes and Feagin*, the Court concludes Bretzloff is entitled to qualified immunity. First, *Barnes* instructs this Court to view Bretzloff's use of force not just in light of what immediately preceded it, but in the context of the entire interaction between Plaintiff and Bretzloff. At each stage of escalation, Plaintiff resisted Bretzloff.

Begin with Bretzloff's decision to open the car door and initially place his hands on Plaintiff. This occurred only after Plaintiff had refused at least three times to produce a driver's license, including *after* Bretzloff had explained he approached Plaintiff because he parked in a no-parking zone. (Bretzloff Bodycam, 0:09–:40). The law does not require Bretzloff to engage in repeated futile attempts to have Plaintiff produce his license, and a reasonable officer would be entitled to believe further attempts would be futile in these circumstances given Plaintiff's obvious recalcitrance. *See Ashford v. Raby*, 951 F.3d 798, 802 (6th Cir. 2020) (explaining officers cannot "peer into [a suspect's] heart to assess his good faith"); Plaintiff Dep., Doc. 130-1, at 125 ("'Q: So you were not gonna give him your driver's license until he gave you an explanation? A: That's right. . . . Q: All right. So you were refusing his orders? A: Yes."); *cf. Saalim*, 947 F.4th at 1017 (Batchelder, J., concurring in part and dissenting in part) ("[B]ased on [Plaintiff's] conduct during the encounter—on full display in the video from Deputy Bretzloff's body cam—[Plaintiff] was never going to give Deputy Bretzloff his driver's license, nor was he going to submit to voluntary handcuffing.").

Further, Bretzloff had probable cause to arrest Plaintiff for refusing to produce a driver's license. *See* Ohio Rev. Code § 4507.35(A). And effectuating a suspect's arrest necessarily involves

the use of some force, particularly when the suspect has already repeatedly refused to follow the officer's orders. *See Freels v. Cnty. of Tipton*, 2010 WL 2364432, at *10 (W.D. Tenn.) ("In effectuating an arrest, law enforcement officers may use a level of force that is reasonably necessary. This force includes placing hands on an arrestee, even one charged with a minor offense such as a misdemeanor."), *aff'd* 455 F. App'x 574; *cf. Pennsylvania v. Mims*, 434 U.S. 106, 111 n.6 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."). The *Saalim* court did not discuss Bretzloff's undisputed probable cause to arrest Plaintiff for violating Ohio Rev. Code § 4507.35(A), nor does Plaintiff meaningfully address it now.[14]

Once Bretzloff attempts to secure Plaintiff's exit from the vehicle, Plaintiff's recalcitrance becomes physical as he leans back into his vehicle away from Bretzloff. *See* Bretzloff Bodycam, at 0:40–:49. Rather than exiting the vehicle when requested, Plaintiff leaned back into it *after* Bretzloff grabbed his arm and attempted to remove him from the vehicle. *See id.* This type of physical resistance to both an officer's commands and the officer's physical attempts to control or move a suspect is a hallmark of active resistance. *See Wright v. City of Euclid*, 962 F.3d 852, 867 (6th Cir. 2020) (explaining tasing a suspect is proper "only if he engaged in resistance that was active, which can take them the form of verbal hostility or a deliberate act of defiance." (citation modified) (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015)); *King v.*

14. Plaintiff attempts to argue Ohio Rev. Code § 4507.35(A) "does not apply" to Plaintiff because the statute only covers one who "drives or operates a motor vehicle upon the public highways." *See* Doc. 150, at 12 n.6 (quoting Ohio Rev. Code § 4507.35(A)). But Plaintiff admitted in his deposition he drove to pick up his clients and drop them off at the Walmart. *See* Plaintiff Dep., Doc. 130-1, at 85–86. He also made Bretzloff aware of this information. *See id.*; Bretzloff Bodycam, 0:35–:37.

*City of Rockford*, 97 F.4th 379, 396 (6th Cir. 2024) (explaining non-compliance coupled with an "outward manifestation" suggesting "'volitional and conscious defiance' toward the officer" constitutes active resistance) (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 533–34 (6th Cir. 2024)); *Johnson v. Dickie*, 804 F. Supp. 3d 759, 768–69 (E.D. Mich. 2025) ("Plaintiff was actively resisting and was struggling as Defendants attempted to remove him from his vehicle."). Again, the *Saalim* court could not analyze these facts when limited to considering those allegations in Plaintiff's Complaint at the pleadings stage.

While Plaintiff briefly complies by stepping out of his vehicle once Bretzloff points the taser at him (and after Bretzloff ordered Plaintiff to exit four separate times), *see* Bretzloff Bodycam, 1:08–:13, the remainder of his conduct cuts in favor of finding he actively resisted Bretzloff. As recounted above, Plaintiff's actions went beyond mere noncompliance or verbal protestation. Multiple times, Plaintiff either attempted to or succeeded in turning around and facing Bretzloff, including after Bretzloff ordered Plaintiff not to "come off" the car and to "stop resisting." *See id.* at 1:13–:43. Perhaps if Bretzloff stood at a distance when issuing these commands, Plaintiff's behavior could fairly be described as mere noncompliance or passive resistance. But that is not the case. At each point Plaintiff turned around, Bretzloff had a hold on Plaintiff's jacket, a taser placed against his abdomen, or both. Thus, when Plaintiff twice turned around, he again did so in defiance *both* of Bretzloff's commands and his physical attempts to control Plaintiff. These repeated acts of defiance, recalcitrance, and indisputably *physical* resistance could reasonably be perceived in the moment as "active" resistance. *See Eldridge*, 533 F. App'x at 535; *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) ("Active resistance includes 'physically struggling with, threatening, or disobeying officers.'" (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012))). This is particularly true when viewed in

combination with Plaintiff's repeated refusals to produce a driver's license and step out of the vehicle. *See Barnes*, 605 U.S.at 81–83. Given its inability to consider Bretzloff's bodycam footage at the pleadings stage, the *Saalim* court did not consider the undisputed fact that, when Plaintiff turned his body, he did so in defiance of Bretzloff's physical attempts to control him.

In sum, consider the facts now presented to the Court at summary judgment and those analyzed in *Feagin*:

> What about evidence of Feagin's active resistance? There was plenty. Recall that Feagin's first actions in the parking lot were to defy Moore's repeated commands to get out of the vehicle. Instead of promptly exiting the car, Feagin opted to roll up the vehicle's (unbroken) windows and seemingly put the car in reverse. Feagin then struggled for several seconds with officers after his car door opened. He kept at least one leg in the vehicle as officers tried to extract him, moving his body back inside the SUV during the struggle. At the moment he was tased, Feagin was still not handcuffed, with his right arm flailing.

*Feagin*, 155 F.4th at 606–07 (internal citations omitted). The *Feagin* court did not find a constitutional violation, let alone a clearly established one. *See id.* Here, Plaintiff's similarly resisted Bretzloff's commands from the outset of their interaction in the Walmart parking lot. He did not exit the car when so ordered and physically struggled with Bretzloff by leaning back into the car. Plaintiff also "kept one leg in the vehicle as officers tried to extract him." *Id*. True, *Feagin* involved a more serious offense than Plaintiff's, namely felonious assault with a vehicle, but Plaintiff's physical resistance to police also went beyond that in *Feagin*, as Plaintiff repeatedly turned around to face Bretzloff in contravention of both his commands and his physical attempts to control Plaintiff. At the very least, Plaintiff's behavior falls within the "zone of twilight"

between active resistance and total submission in which Bretzloff is entitled to qualified immunity for his use of a taser.[15]

Thus, Bretzloff is entitled to qualified immunity for his decision to use a taser to gain Plaintiff's compliance and put an end to his resistance. The same conclusion applies even if the Court were to separately consider each instance in which Bretzloff deployed his taser, as Plaintiff continued to actively resist between taser deployments. *See* Bretzloff Bodycam, 1:45–:55 (showing Plaintiff fervently moving his hands and grabbing Bretzloff's right arm).

Finally, Bretzloff is entitled to qualified immunity for any alleged excessive force used to bring Plaintiff to the ground after he was handcuffed. At most, Plaintiff's testimony, which is not blatantly contradicted by the video, suggests he was "pulled" to the ground after being handcuffed. (Plaintiff Dep., Doc. 130-1, at 141). However, at the time, it was not clearly established that pulling a recalcitrant suspect to the ground after twice asking them to sit themselves would violate their Fourth Amendment rights. *See* Bretzloff Bodycam, 2:57–3:05. While it was clearly established that a restrained suspect may not be subjected to gratuitous violence, pulling a recent arrestee to the ground, without using a violent takedown maneuver or other deliberately "violent force," is not "gratuitous violence." *Franke v. Janes*, 168 F.4th 797, 811–12 (6th Cir. 2026) (collecting cases and finding "gratuitous violence" to include officers "vigorously yank[ing]" an individual's arm such that the individual tore their rotator cuff, slapping a handcuffed suspect in the face, and using their entire weight to fracture a suspect's arm in multiple places in an attempt to handcuff them); *See McColman v. St. Clair Cnty.*, 479 F. App'x 1, 6–7 (6th Cir. 2012) (finding no use of gratuitous violence after handcuffing, where the suspect "did not actively resist" but the officer nonetheless

15. That the other two *Graham* factors weigh in Plaintiff's favor does not alter this Court's conclusion. *See Bell v. Wolfish*, 441 U.S 520, 559 (1979) ("The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.").

"pulled [the suspect] into the car[,] caused her prosthetic leg to fall off and caused bruising to her arms").

The Court finds Bretzloff entitled to qualified immunity and, accordingly, summary judgment on Plaintiff's excessive force claim. Granting the County Defendants' Motion for Summary Judgment on this claim also necessitates granting it with respect to those claims that are purely derivative of Plaintiff's excessive force claims. In other words, the County Defendants (and Walmart Defendants) are additionally entitled to summary judgment on Plaintiff's vicarious liability or *respondeat superior* claims, as such claims are viable only where the alleged employee is liable for damages to the plaintiff. *See* Doc. 137, at 10–11; Doc. 138, at 18-19; *Comer v. Risko*, 833 N.E.3d 712, 716–17 (Ohio 2005) ("If there is no liability assigned to the agent, it logically follows that there can be no liability imposed upon the principal for the agent's actions."). Accordingly, the Court grants the County and Walmart Defendants' Motions for Summary Judgment in this respect.

<u>Negligent Hiring, Training, and Supervision</u>

Next is Plaintiff's state law claim for negligent hiring, training, supervision, or retention asserted against the Walmart Defendants and McNett. Both sets of Defendants move for summary judgment on this claim. *See* Doc. 137, at 12–20; Doc. 138, at 28–30. Under Ohio law, a claim for negligent hiring, training, supervision, or retention requires the plaintiff to prove the following elements: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission caus[ed] the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining [or training or supervising] the employee [w]as the proximate cause of plaintiff's injuries." *E.B. v.*

*Home Depot, Inc.*, 2024 WL 3179662, at *6 (N.D. Ohio) (quoting *Sheldon v. Kettering Health Network*, 40 N.E.3d 661, 678 (Ohio Ct. App. 2015)).

The Walmart Defendants argue, *inter alia*, they had no active or constructive knowledge of Bretzloff's alleged incompetence. *See* Doc. 137, at 17–18; Doc. 151, at 16–17. The Court agrees. To demonstrate Walmart's knowledge, Plaintiff must show Walmart "knew or should have known of [Bretzloff's] criminal or tortious propensities." *Silvers v. Clay Twp. Police*, 117 N.E.3d 954, 968 (Ohio Ct. App. 2018) (quoting *Jackson v. Hogeback*, 2014 WL 2742945, at *7 (Ohio Ct. App.)). Here, Plaintiff argues only as to constructive knowledge, contending the Walmart Defendants "should have known about Bretzloff's IAB History and his complete lack of [Ohio Peace Officer Training Academy] training in 2019 and 2020 prior to the incident" where Bretzloff's Internal Affairs Bureau History ("IAB History") refers to a series of internal affairs complaints and reports pertaining to Bretzloff. (Doc. 151, at 32); (Bretzloff Dep., Doc. 124-1, at 377–412). Plaintiff does not specify which of these incidents, had the Walmart Defendants discovered them by "vetting" Bretzloff as Plaintiff suggests was required, would have put them on notice of Bretzloff's alleged criminal or tortious propensity. On the Court's own review, the only submitted IAB report which found Plaintiff responsible for misconduct addressed his failure to use his bodycam when dealing with a retired sheriff's deputy suspected of drunk driving. *See id.* at 407–12. For those reports pertaining to Bretzloff's alleged use of excessive force, the IAB found no misconduct. *See id.* at 377, 381, 393. There is thus nothing in Bretzloff's IAB history, or the record as a whole, which could reasonably put Walmart on notice he has a "criminal or tortious" propensity to commit the acts of which Plaintiff complains, even assuming they were required to independently investigate such history. Nor does a mere *absence* of a certain type of training serve as affirmative evidence of Bretzloff's tortious or criminal propensity. *See* Doc. 151, at 25; *Jackson*,

2014 WL 2742945, at *7 (explaining the plaintiff must demonstrate "facts which indicate that the individual hired had a *past history of criminal, tortious, or otherwise dangerous conduct* . . . which the [employer] . . . could have discovered through reasonable investigation" (quoting *Byrd v. Faber*, 57 Ohio St. 3d 56, 61 (Ohio 1991) (emphasis added))). Accordingly, the Walmart Defendants are entitled to summary judgment on this claim.

McNett is entitled to summary judgment on this claim for a different reason—he was not Bretzloff's employer. *See* Doc. 138, at 28. Plaintiff does not contest the County Defendants' argument on this point and cites no evidence in the record suggesting McNett retained control over Bretzloff sufficient to create an employment relationship. *See* Doc. 150, at 37–38 (addressing only McNett's alleged negligence in failing to vet Bretzloff).

Thus, the Court grants the Walmart and County Defendants' Motions for Summary Judgment with respect to Plaintiff's state law negligent hiring, training, supervision, and retention claim.

Municipal Liability

Finally, the Court must resolve the County Defendants' Motion for Summary Judgment with respect to Plaintiff's municipal liability claims. *See* Doc. 138, at 15–18. Plaintiff asserts: (1) a *Monell* claim based on the inadequacy of the Lucas County Sheriff's Office ("LSCO") use of force policy; and (2) a related *Canton* liability claim based on the LCSO's failure to adequately train Bretzloff. *See* Doc. 150, at 34–37; Doc. 1, at 27–31. The Court finds the County Defendants entitled to summary judgment on both claims.

*Unlawful Custom or Policy*

A municipality sued under § 1983 is liable for damages only if the injury occurs pursuant to a municipal custom or policy. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In other

words, the doctrine of *respondeat superior* does not apply to municipalities in § 1983 actions. *Id.* at 691. To succeed on a § 1983 claim based on a municipal policy or custom, Plaintiffs must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993). A plaintiff generally has four ways to demonstrate an unlawful policy or custom: "[t]he plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). "To prevail on [a] § 1983 *Monell* claim[ ] against [a municipality] under the Fourth and Fourteenth Amendments, the plaintiffs must show (1) that they suffered a constitutional violation and (2) that a municipal policy or custom directly caused the violation." *Hardrick v. City of Detroit*, 876 F.3d 238, 243 (6th Cir. 2017) (citing *Monell*, 436 U.S. at 690-92). That is, "beyond having to identify 'conduct properly attributable to the municipality' itself, a plaintiff 'must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged.'" *Cherrington v. Skeeter,* 344 F.3d 631, 645 (6th Cir. 2003) (quoting *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)); *Franklin v. Franklin Cnty.*, 115 F.4th 461, 471 (6th Cir. 2024) (explaining a plaintiff must demonstrate "'a direct causal link' between the policy and the alleged constitutional violation such that the County's 'deliberate conduct' can be deemed the 'moving force' behind the violation." (quoting *Graham ex rel.Est. of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004)).

Even assuming Plaintiff suffered a constitutional injury at Bretzloff's hands, his *Monell* claim fails. The sole manner which Plaintiff suggests the LCSO use of force policy was inadequate

is its failure to "define verbal persuasion" and "discuss de-escalation." (Doc. 150, at 34). After Plaintiff's arrest, the LCSO amended its use of force policy to include a definition of "verbal persuasion" and to specify verbal persuasion as the "first preferred option in an attempt to de-escalation [sic] the situation." *Id.* at 35 (quoting Tharp Dep. Ex. 24, Doc. 127-1, at 135)). But Plaintiff fails to show a "direct causal link" between the original policy and his alleged constitutional injury. Importantly, Plaintiff must demonstrate the challenged policy did more than provide Bretzloff with the "opportunity" to violate his constitutional rights. *Franklin*, 115 F.4th at 471. Rather, the Plaintiff's injury must stem directly from *execution* of the challenged policy. *See id.* (citing *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)). In other words, Plaintiff must provide evidence Bretzloff's unconstitutional actions were "pursuant to" LCSO's policy. *Id.* (quoting *Garner*, 8 F.3d at 365). This Plaintiff fails to do, as he points only to the alleged *lack* of adequate information on verbal persuasion and de-escalation contained in the LCSO use of force policy which, if included, he asserts may have prevented his injury. *See* Doc. 150, at 34–35. But an officer cannot "execute" or act "pursuant" to policy information which does not exist. At most, the absence of a definition of "verbal persuasion" or "de-escalation techniques" provided Bretzloff with the opportunity to violate Plaintiff's rights; it did not mandate or "directly" cause Bretzloff to do so. For this reason, Plaintiff's *Monell* claim rooted in the County Defendants' maintenance of an allegedly inadequate use of force policy fails.

*Failure to Train*

Plaintiff's *City of Canton v. Harris*, 489 U.S. 378 (1989), or "failure to train" claim similarly fails.[16] To succeed on a failure to train claim, a plaintiff must prove the following: "(1)

16. In many circumstances, deliberate-indifference-based *Monell* claims fail where the Court grants the individual officer qualified immunity, as "a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet

the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Russo v. City of Cincinnati*, 952 F.3d 1036, 1046 (6th Cir. 1992)). In other words, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010) (quoting *Fisher v. Harden,* 398 F.3d 837, 849 (6th Cir. 2005)).

Plaintiff points to no record evidence demonstrating LCSO allowing its officers to complete internal LCSO training rather than state training through the Ohio Peace Officer Training Academy led to "prior instances of unconstitutional conduct" which went ignored. *See* Doc. 150, at 36–37. Indeed, Plaintiff does not even point to deposition testimony suggesting Ohio Peace Officer Training Academy training courses are preferable to those offered by LCSO or would otherwise have any propensity to prevent the incident of which Plaintiff complains. *See Miller*, 606 F.3d at 255. That failure is fatal.

Thus, the Court finds the County Defendants entitled to summary judgment on Plaintiff's municipal liability claims and grants their Motion for Summary Judgment in this respect.

---

been clearly established." *Hagans v. Franklin Cnty. Sherrif's Off.*, 695 F.3d 505, 511 (6th Cir. 2012) (quoting *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (en banc)). The Court addresses the independent substance of Plaintiff's municipal liability claims in the interest of thoroughness.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that the County Defendants' Motion for Summary Judgment (Doc. 136) be, and the same hereby is, GRANTED; and it is

FURTHER ORDERED that the Walmart Defendants' Motion for Summary Judgment (Doc. 137), be and the same hereby is, GRANTED; and it is

FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment (Doc. 142) be, and the same hereby is, DENIED.

s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: September 24, 2026